**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| MALCOLM WIGGINS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 17-CV-583-SMY |
| | ) |
| JOHN BALDWIN, et al., | ) |
| | ) |
| Defendants. | ) |

# **MEMORANDUM AND ORDER**

Plaintiff Malcom Wiggins, an inmate currently incarcerated at Hill Correctional Center, filed this action pursuant to 42 U.S.C. § 1983 for deprivations of his constitutional rights arising from a strip search and alleged deliberate indifference to his serious medical needs while he was housed at Shawnee Correctional Center ("Shawnee").

Following initial screening of the Complaint under 28 U.S.C. § 1915A, Plaintiff proceeded on four claims:

> Count 1: John Doe used excessive force on Plaintiff when he cuffed his hands too tightly, causing injury in violation of the Eighth Amendment;

> Count 2: Doe and Unknown Orange Crush Member conducted an unreasonable strip search of Plaintiff when they conducted it in a humiliating manner, in violation of the Eighth Amendment;

> Count 3: Dennison and Yurkovich had a custom or practice of directing and/or condoning strip searches and/or shakedowns to be conducted in an unreasonable manner in violation of the Eighth Amendment;

> Count 4: David, Apostal, and Pittayathikhun were deliberately indifferent to Plaintiff's serious medical needs when they delayed treating him after he suffered injuries during the shakedown and persisted in a course of medical treatment after it proved ineffective in violation of the Eighth Amendment.

(Doc. 9). Plaintiff's recruited counsel subsequently filed an Amended Complaint (Doc. 127) asserting the same claims.

The case is now before the Court for consideration of Defendants Dennison, Baldwin, David, Apostol and Pittayathikhun's Motions for Summary Judgment seeking dismissal of Counts 3 and 4 (Docs. 154 and 163).[1] Plaintiff has filed oppositions to both Motions (Docs. 164 and 173). For the following reasons, Defendants' Motions are **GRANTED.**

## Material Facts

On August 8, 2016, Plaintiff was part of a "shakedown" at Shawnee during which prisoners' cells, property and persons were searched for contraband. (Doc. 163-2, pp. 94, 100-102, 107). Plaintiff testified that during the strip search, he was required to lift his genitals, spread his butt cheeks, and then put his fingers in his mouth without washing them. (*Id.*, pp. 101-102, 123). Plaintiff's left shoulder was injured in the process, which Plaintiff attributes to being cuffed too tightly and being left in handcuffs for two hours. (*Id.*, pp. 32-33, 110-111). Defendant Dennison was Warden of Shawnee at the time.

On August 24, 2016, Plaintiff was seen by Defendant Dr. Apostol and complained of numbness and swelling in his left hand and pain in his shoulder. (Doc. 155-1, p. 4). Dr. Apostol diagnosed an acute sprain of Plaintiff's left AC joint but did not prescribe any pain medication. (*Id.*). Dr. Apostol submitted an affidavit in this case indicating that because Plaintiff was taking a blood-thinning medication and the injury did not appear to be extensive, he concluded that allowing the injury to heal naturally was the better course of treatment. (Doc. 155-2, p. 2). He also concluded that an MRI or referral to an orthopedist was not medically indicated. (*Id.*). Dr.

---

[1] Defendant Yurkovich was dismissed via stipulation of the parties. Defendants John Doe and Unknown Orange Crush Member have not been identified and the deadline for doing so passed on March 23, 2018. (Doc. 59, p. 3). The Court will address their status by separate order.

Apostol, who was regularly employed at Vienna Correctional Center, never saw Plaintiff again. (*Id.*, p. 1, 3).

On September 26, 2016, Plaintiff was seen by Defendant Dr. David for unresolved shoulder pain and numbness in his hand. (Doc. 155-1, p. 6). Dr. David noted no deformities, diagnosed an AC joint sprain, and prescribed naproxen and range-of-motion exercises. (*Id.*). Dr. David also concluded that an MRI or specialist visit were not medically indicated at that time. (Doc. 155-3). He made a note for Plaintiff to follow up as needed, but never saw Plaintiff again. (*Id.*; Doc. 155-1, p. 6).[2]

Plaintiff was seen by Defendant Nurse Practitioner Pittayathikhun on November 4, 2016. He reported numbness and exhibiting a decreased range of motion in his left shoulder among other issues. (Doc. 155-1, pp. 8-9). NP Pittayathikhun characterized his injury as a likely AC joint tear, prescribed a 25 mg dose of nortriptyline (a medication which can relieve nerve pain), provided Plaintiff additional range-of-motion exercises. (*Id.*; Doc. 155-5, p. 2).

Plaintiff saw Dr. Caldwell on November 13, 2016. Plaintiff testified that Dr. Caldwell told him he probably had nerve damage and that an MRI and/or nerve conduction study would be the only way to "be able to see what really wrong." (Doc. 163-2, pp. 67, 69).

Plaintiff saw NP Pittayathikhun again on December 13, 2016 and informed her the nortriptyline was not helping. (Doc. 155-1, p. 11). She noted tenderness, mild swelling, decreased range of motion and decreased strength in his left shoulder, as well as neuropathy. (*Id.*). She ordered an x-ray of the shoulder for the following week and increased his dosage of nortriptyline to 50 mg. (*Id.*). The x-ray revealed mild osteoarthritis in two joints, but no acute bony fractures or dislocation. (*Id.*, p. 12). Plaintiff saw NP Pittayathikhun for a follow-up on December 27, 2016

---

[2] There is some disagreement between the parties as to whether Dr. David ordered a follow-up visit. The medical record for the visit ends "FU prn," which is "follow up as needed" in medical shorthand.

during which he reported the increased dose of nortriptyline was helping the pain but not the numbness. (*Id.*, p. 13). Pittayathikhun extended his nortriptyline prescription. (*Id.*).

On April 6, 2017, Plaintiff informed a nurse that he wanted to discontinue the nortriptyline, and Pittayathikhun complied. (*Id.*, pp. 14-15). He saw her again on May 5, 2017 complaining of arm pain. Pittayathikhun restarted him on nortriptyline. (*Id.*, pp. 16-17). On May 9, 2017, Plaintiff informed Pittayathikhun that the nortriptyline was not helping. (Doc. 155-5, p. 3). As a result, Pittayathikhun switched him to Neurontin (gabapentin). (*Id.*). Plaintiff refused his medications from May 31, 2017 to June 6, 2017.

On June 7, 2017, Plaintiff again saw Pittayathikhun for shoulder pain. (Doc. 155-1, p. 42). She ordered another x-ray on his shoulder which revealed slight progression of the osteoarthritis in his AC joint since the prior x-ray. (*Id.*, pp. 43-44). Plaintiff was transferred to Illinois River Correctional Center at the end of June 2017. (*Id.*, p. 45).

## Discussion

Summary judgment is appropriate only if the moving party can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). Once a properly supported motion for summary judgment is filed, the adverse party "must set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017) (quoting *Anderson*, 477 U.S. at 248). When deciding a summary judgment motion, the Court views the facts in the light most favorable to, and draws all reasonable

inferences in favor of, the nonmoving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

### Count 3

Plaintiff claims the painful position in which he was cuffed and the "humiliating manner" in which the strip search was conducted were part of regular shakedown procedures to which Dennison (as Warden) had turned a blind eye. He sued Dennison in his individual capacity (Doc. 127, pp. 4, 7). *Respondeat superior* liability is not actionable under § 1983. *Ashcroft v. Iqbal*, 556 US. 662, 676 (2009). "Liability under [Section] 1983 is direct rather than vicarious; supervisors are responsible for their own acts but not for those of subordinates, or for failing to ensure that subordinates carry out their tasks correctly." *Horshaw v. Casper*, 910 F.3d 1027, 1029 (7th Cir. 2018). To be liable, a supervisor "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Doe v. Purdue Univ.*, 928 F.3d 652, 664 (7th Cir. 2019).

Plaintiff has provided no evidence that Dennison was physically present during the shakedown and search. He argues that because the officers participating were wearing helmets and no identification, it "would have been impossible for [Plaintiff] to accurately know if Mr. Dennison was actually present for the shakedown." (Doc. 173, p. 5). But such an argument cannot defeat summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts.")

Plaintiff also argues that because Dennison has "final policymaking authority" and "would be aware, facilitate, approve and/or condone the procedures for shakedown[,]" he would therefore be "personally responsible for the deprivation of [Plaintiff's] constitutional rights." (Doc. 173, p. 6). This argument is essentially another attempt to impose supervisory responsibility. Plaintiff

presents no evidence from which a finder of fact could reasonably conclude that the officers' bad actions in conducting the shakedown were done in accordance with a policy, custom or widespread practice or that Dennison was actually aware of such a policy, custom or widespread practice. Once a party has made a properly supported motion for summary judgment, the nonmoving party must submit evidentiary materials that "set forth specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e). In the absence of any such facts, summary judgment is warranted.[3]

### Count 4

Prison officials inflict cruel and unusual punishment in violation of the Eighth Amendment when they are deliberately indifferent to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To prevail on such a claim, an inmate must establish (1) that he suffered from an objectively serious medical condition; and (2) that the defendant was deliberately indifferent to a risk of serious harm from that condition. *Petties v. Carter*, 836 F.3d 722, 727 (7th Cir. 2016). There is no dispute that Plaintiff's shoulder injury is objectively serious. Thus, the first element is satisfied.

The second element requires proof that the defendant knew of facts from which he could infer that a substantial risk of serious harm exists, and he must actually draw the inference. *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016). "Mere negligence or even gross negligence does not constitute deliberate indifference." *Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir. 1996). Rather, in the prison context, a medical professional "may be held to have displayed deliberate indifference only if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008).

---

[3] Defendant Dennison also asserts a qualified immunity defense. However, as summary judgment is appropriate on the merits of the claim, the Court will not address this issue.

Relatedly, "an inmate is not entitled to demand specific care," *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011), and medical professionals may choose from "a range of acceptable courses based on prevailing standards in the field," *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). For example, "[a] prison physician is not required to authorize a visit to a specialist in order to render constitutionally acceptable medical care. Like other medical decisions, the choice whether to refer a prisoner to a specialist involves the exercise of medical discretion, and so refusal to refer supports a claim of deliberate indifference only if that choice is blatantly inappropriate[.]" *Pyles v. Fahim*, 771 F.3d 403, 411 (7th Cir. 2014) (quotations and citations omitted). Deference is given to medical professionals' treatment decisions unless there is evidence that "no minimally competent professional would have so responded under those circumstances." *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019) (citations omitted).

Plaintiff cites to Dr. Caldwell's statements to him that a nerve conduction study and/or MRI were necessary to properly diagnose his condition. However, Plaintiff's account of Dr. Caldwell's opinion is inadmissible hearsay and cannot be considered with respect to summary judgment. *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016). Moreover, a difference of opinion between two doctors is insufficient to survive summary judgment on a deliberate-indifference claim. *Zaya v. Sood*, 836 F.3d 800, 803 (7th Cir. 2016)

### Dr. Apostol

The record establishes that there is no triable issue as to Dr. Apostol's alleged deliberate indifference. The fact that Dr. Apostol was incorrect about Plaintiff's shoulder healing naturally does not suffice to show indifference. *See Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006) ("It is not enough to show, for instance, that a doctor should have known that surgery was necessary; rather, the doctor must know that surgery was necessary and then consciously disregard

that need in order to be held deliberately indifferent."). Dr. Apostol averred in his affidavit that in his medical judgment, a specialist consultation or MRI were not indicated at the time he saw Plaintiff. Under other circumstances, the failure to provide any treatment for Plaintiff's pain might be enough to proceed to trial, but Dr. Apostol explained his reasoning for not prescribing pain medication, which is at least facially reasonable in light of Plaintiff taking blood thinners. On the other hand, Plaintiff has provided no evidence to suggest Dr. Apostol's decisions constituted a substantial departure from accepted professional judgment, practice, or standards so as to demonstrate that Dr. Apostol's decision making was not anchored in professional judgment. As such, Dr. Apostol is entitled to summary judgment.

### Dr. David

The record also fails to show a triable issue as to Dr. David's alleged deliberate indifference. Dr. David saw Plaintiff once. Based on his assessment that Plaintiff's shoulder and hand were not healing and he had some limited range-of-motion, Dr. David prescribed pain medication and range-of-motion exercises. Plaintiff argues that Dr. David was deliberately indifferent because he delayed prescribing effective pain medication, delayed ordering imaging, failed to order a nerve conduction study and failed to send him to a shoulder specialist.

Dr. David did not delay prescribing effective pain medication – he prescribed pain medication the first and only time he treated Plaintiff, and there is no indication that he knew it would be ineffective. As to the remainder of Plaintiff's argument, he has failed to produce any evidence that Dr. David's decisions were such a substantial departure from accepted professional judgment, practice, or standards as to allow an inference that he did not reasonably exercise judgment.

### NP Pittayathikhun

The undisputed material facts show that NP Pittayathikhun was not deliberately indifferent to Plaintiff's condition. She prescribed a different class of medication to deal with Plaintiff's pain that had not been relieved by naproxen and adjusted the dose until Plaintiff indicated it provided relief. She complied with Plaintiff's demand to be taken off nortriptyline and his subsequent request to be put back on the medication. When Plaintiff indicated nortriptyline was no longer effective, she switched him to gabapentin. NP Pittayathikhun also ordered two rounds of x-rays. Because Plaintiff was transferred relatively shortly after the second set of x-rays showed some progression of his osteoarthritis and Pittayathikhun did not see him before his transfer, she cannot be faulted for inaction in the face of that new information. There is no evidence that her treatment decisions were outside the accepted range of medical judgment, let alone so far removed to suggest deliberate indifference. Summary judgment in her favor is therefore appropriate.

### John Baldwin and Rob Jeffreys

Defendant John Baldwin was named in his official capacity as Director of IDOC solely for the purpose of carrying out injunctive relief. Baldwin has been succeeded as Director by Rob Jeffreys. The injunctive relief Plaintiff seeks relates only to his allegations of deliberate indifference to a serious medical need against Dr. Apostol, Dr. David and Pittayathikhun. Given the dismissal of the medical claim, there is no basis on which to grant injunctive relief. As such, Baldwin (and Jeffreys) will be dismissed as well.

### **CONCLUSION**

For the foregoing reasons, Defendants' Motions for Summary Judgment (Docs. 154 and 163) are **GRANTED** on Counts 3 and 4 of the Amended Complaint. Accordingly, Plaintiff's claims against Dennison, Dr. Apostol, Dr. David, Pittayathikhun and Baldwin are **DISMISSED**

**with prejudice.**  The Clerk of Court is **DIRECTED** to enter judgment accordingly at the close the case.

    **IT IS SO ORDERED.**

    **DATED:  May 27, 2020**

                                               **s/ Staci M. Yandle**
                                               **STACI M. YANDLE**
                                               **United States District Judge**